In The
*Court of Appeals*
*Ninth District of Texas at Beaumont*
NO. 09-17-00491-CV

**LA JUANA WILLIAMS, Appellant**

**V.**

**OFFICE OF THE ATTORNEY GENERAL, Appellee**

**On Appeal from the 136th District Court**
**Jefferson County, Texas**
**Trial Cause No. D-195,693**

**MEMORANDUM OPINION**

In this Texas Commission on Human Rights Act (TCHRA) claim, Appellant La Juana Williams, appeals the trial court's order granting a plea to the jurisdiction filed by her employer, the Office of the Attorney General (OAG) (Defendant or Appellee). *See generally* Tex. Lab. Code Ann. §§ 21.051-.556 (West 2015 & Supp. 2018). In Appellant's Brief, Williams presents two stated issues: (1) whether the trial court erred in concluding that pretext is a prima facie element of her TCHRA claim, and (2) whether the trial court erred in concluding that Williams failed to establish a

prima facie claim of retaliation. In her Reply Brief, Williams subdivides her issues into three parts as follows:

1. Whether the trial court erred by concluding that Williams did not meet a prima facie case of retaliation for the termination of her employment.

2. Whether the OAG met its burden of production for its legitimate[] reasons for terminating her employment.

3. Whether Williams presented evidence of pretext.

We consider the subparts as phrased in both her original appellate brief and in her reply to be part of the same issue—whether the trial court erred in granting the plea to the jurisdiction. We affirm.

Background

Williams alleged in her Original Petition that she is an African American female who began working for the OAG Child Support Division in 1990. In her deposition, she testified that she started her work with the child support division at the Nederland office, transferred to an office in Austin, then transferred to the Beaumont Office where she worked until 2005. In 2005, she transferred to the Houston office, and she worked in the Houston office until January 2008, when she requested a transfer back to the Nederland or Beaumont office. Shortly before she asked for the transfer back to the Nederland or Beaumont office, her husband had

died, and another family member was ill. The OAG transferred her back to the Nederland office in 2008.

Williams alleged in her Petition that she began reporting to Winton "Jay" Webster, a Caucasian male, in March 2008. Williams alleged that she personally observed Webster "mistreat minority employees and treat Caucasian employees more favorably regarding the terms of their employment." Williams claimed that Webster would at times refuse to speak to her and would "cut her off, yell at [her], roll his eyes at [her], or hum out loud to drown [her] out when [she] would speak in meetings." Williams's Petition also alleges that Webster ignored for months without reason her request to relocate her office space to a more private location. According to Williams's Petition, when Williams asked Webster if he was making employment decisions based on her race, he would not deny the accusation but respond that he was the manager and if she did not like the decisions he made she could find another job. The Petition alleges that Williams made a report to Regional Administrator Charles "Chip" Arnold "around Thanksgiving 2011" that Webster had issues with her based on race and had taken away her job duties, taken away her job title as a Review Officer, and had made her a Customer Inquiry Representative ("CIR"). According to the Petition, Webster retaliated against Williams after she made the

report to Arnold, and Webster assigned her to the duties and title of Child Support Officer IV-Established Caseload without providing her training for the position.

Williams alleged that her employment was terminated on August 1, 2012, and that her employer subjected her to "unfavorable, disparate treatment, a hostile environment and harassment based on her race (African American) and her gender (female)." Williams also alleged that her employer "discriminate[d] and retaliated against Plaintiff in violation of the [TCHRA], . . . based on her race (African American) and her gender (female) and for engaging in protected activity." Williams sought an unspecified amount in damages, interest, and attorney's fees.

The OAG filed an Answer, Affirmative Defenses, and Requests for Disclosure. The OAG generally denied the allegations and asserted several affirmative defenses, including governmental immunity,[1] and the OAG alleged that the decisions challenged by Plaintiff were made for legitimate, non-discriminatory and non-retaliatory reasons.

After engaging in written discovery and obtaining Williams's deposition, the OAG filed Defendant's Plea to the Jurisdiction and Traditional Motion for Summary Judgment (the "Plea"). The OAG alleged in its Plea that Williams failed to meet the

[1] We do not address the OAG's other affirmative defenses herein as they are not pertinent to the issues on appeal.

4

prima facie requirements of her TCHRA retaliation claim, and that Williams failed to establish a causal connection. The OAG alleged that it terminated Williams because she (1) failed to report alleged child abuse to Child Protective Services; (2) invoked the authority of the OAG when instructing a parent to return his child to a potentially dangerous situation; and (3) scheduled an in-person, in-the-office conference on a child support case that had been flagged for family violence contrary to established policy.

Williams filed a response arguing that the OAG's stated reasons for her dismissal were "false, fabricated, and pretextual." The trial court held a hearing and heard arguments from the parties.[2] According to the Appellee's brief, quoting the trial court's letter ruling, "[a]t the beginning of the hearing [on the OAG's dispositive motions], [Williams] voluntarily abandoned her other discrimination claims and elected to proceed only on her retaliation claim under the TCHRA." Williams's briefing on appeal complains solely about her retaliation claim.

In an October 24, 2017 letter ruling, the trial court explained it was going to enter an order granting the plea to the jurisdiction because the plaintiff had failed to establish "a causal link between the protected activity and the adverse employment

---

[2] The appellate record does not include a Reporter's Record of the hearing.

action."[3] The trial court entered an order granting the Plea and Motion for Summary Judgment and it dismissed the case. Williams timely filed a notice of appeal.

## OAG's Plea to the Jurisdiction

The OAG alleged in its Plea that Williams's termination stemmed from three instances:

> [i]n July 2012, the OAG determined that Williams had (1) failed to report alleged child abuse to Child Protective Services; (2) invoked the authority of the OAG when instructing a parent to return their child to a potentially dangerous situation; and (3) scheduled an in-person, in-the-office conference on a child support case that had been flagged for family violence. Because this conduct violated OAG policy and put people at risk, the OAG terminated her employment.

In support of its Plea, the OAG produced affidavits from William Boyd, Webster, Arnold, and Myra Sines; emails; the termination letter; a request for termination memo; a transcript of the oral deposition of Williams; documents from the OAG's office including the Family Violence Policy (signed by Williams); Williams's receipt of the OAG policy for Reporting Child Abuse; and excerpts from Williams's responses to Interrogatories. Certain documents were also attached to and described in the affidavits, including a transcription of the recorded telephone call wherein

---

[3] Letter rulings do not constitute formal findings. *Cherokee Water Co. v. Gregg County Appraisal Dist.*, 801 S.W.2d 872, 878 (Tex. 1990).

6

Williams took a call from a custodial parent about alleged abuse, and a complaint from a parent.

In Williams's deposition, a transcript of which was attached to the Plea, she testified that, from the first day she started work in the Nederland office, Webster was hostile to her. Williams described one instance when she went into Webster's office to ask about a medical leave issue, he referred her to Boyd (her direct manager), and Webster walked out. On another occasion, she testified in her deposition that Webster called Williams into a conference room and began writing her up for failing to work on a case. According to Williams, when she showed him documents that showed she had worked on the case, Webster "snatched the paper" out of her hands and said, "Well, then I guess I need to talk to my attorney."

Williams also testified in her deposition that Webster was initially unresponsive to her request for a quiet office. According to Williams, in a staff meeting, Webster said there was "too much visiting going on in another coworker's office and he wanted it stopped[.]" Then he said, "So, no, . . . you can't move." Williams testified she sent him an email voicing her unhappiness about the way he handled the situation. Webster responded by saying, "No, your request [to move offices] is not wrong; and I apologize if you feel slighted about me bringing it up in a staff meeting." He also indicated that the request to move offices was "denied at

7

this time, but it may happen in the near future." Later, Williams was allowed to move to another office.

Williams testified that on other occasions Webster would not acknowledge her "good morning" greetings, cut her off while she was speaking and roll his eyes or hum or whistle when she asked questions during monthly staff meetings, that he was unresponsive to her request for more training once she was moved to a new position, and that he would yell at her.

Williams testified that she eventually confronted Webster and asked him why he treated her the way he did and whether it had anything to do with her race. According to Williams, Webster responded by saying, "I am the manager here, I make all decisions in this office, whether you feel they are good or bad. If you don't like it, you can find you another job."

Williams claims that in 2011 she told Regional Administrator Chip Arnold when he was visiting the Nederland office that she was about to file a racial discrimination suit against Webster, that she was dissatisfied with her CIR work, and that she could be better utilized in another section. Although Williams testified that she felt the CIR responsibilities she had been given were "another personal attack" by Webster, she also admitted that she volunteered to take the CIR responsibilities

when a co-worker was out on medical leave. Williams testified that Arnold apologized and that she was moved to work in establishment as she had requested.

According to Williams, after her complaint to Arnold, Webster gave her more "cold shoulder" treatment, exhibited hostile body language, and used a forceful tone when speaking to her. Williams testified in her deposition that Webster never physically touched her, never called her any names, and never physically threatened her.

In the affidavit of William Boyd attached to the OAG's Plea, Boyd averred, in relevant part:

> [] In July 2004, I began working for the Child Support Division of the [OAG]. I worked in the Nederland [] Office from September 2004 to December 2015. Within that time, from May 2005 to December 2015, I was the Office Supervisor. During 2011 and 2012, I also periodically assumed some responsibilities that were normally assigned to the Office Manager, Veronica Burns, after she got into a terrible car accident. During these time periods, I acted as both office supervisor and office manager. During my time as Office Supervisor, our Nederland [] Office staff meetings were held on a monthly basis.
>
> [] At some point during Lajuana Williams's employment, another employee, Lori Williams had a medical situation. At the time of this medical situation, Lori Williams had been working as the customer service inquiry representative. When Lori Williams went out on medical leave, Lajuana Williams became our customer service inquiry representative.
>
> [] In late 2011, a long-time establishment worker was preparing to retire. The decision was made for Lajuana Williams to become an establishment worker. To give her an opportunity to learn the

9

responsibilities for the new position, she was assigned to shadow an existing establishment worker.

[] At some point after Lajuana Williams became an establishment worker, she came to me and requested formal training. I told her that I would reach out to the regional trainer for Region 5, which includes the Nederland office. I contacted the regional trainer for Region 5 and learned that Region 5 did not have any establishment trainings scheduled, but that they would coordinate with the Houston region to see if the Houston region had any establishment training available. I also know that Mona Gabriel, the office manager at the time, printed the establishment training manual, hole-punched it, and gave it to Lajuana Williams to help her learn the job.

[] In July 2012, an incident arose related to Lajuana Williams's failure to report a child abuse call to Child Protective Services. The Regional Customer Service Center ("RCSC") practice at that time was for RCSC staff to forward calls reporting child abuse from the RCSC to the local field office. After the RCSC staffer forwarded the call to the field office, the staffer would send an email notification to their manager. The next day, the manager would check the case file in the Texas Child Support Enforcement System ("TXCSES") to ensure that the appropriate documentation had been completed by the field office. If the field office followed policy, there would be a note in the TXCSES case file indicating that the alleged child abuse had been reported to Child Protective Services. If that documentation was missing from the case file, the call center would follow-up with the field office to ensure that the report to DFPS had been completed and documented.

[] On July 19, 2012, pursuant to the practice described above, the management email account for the Nederland [] Office received the email from Heather Murphy, RCSC Supervisor for Region 5. Heather Murphy's email included an email from Amanda Head, describing a report of child abuse the RCSC office for Region 5 had received. A true and accurate copy of the email from Heather Murphy is attached to this affidavit as Exhibit A.

10

[] Pursuant to my responsibilities as Office Supervisor, I looked up the case in TXCSES and determined that Lajuana Williams had received the phone call from the RCSC. However, I did not see the required report documenting the child abuse call and report to Child Protective Services. On July 20, 2012, I emailed Lajuana Williams to ask her about the call. A true and accurate copy of my email to Lajuana Williams is attached to this affidavit as Exhibit B.

[] In my subsequent conversation with Lajuana Williams, she told me that she had not received a call involving a report of child abuse and that the call center had not told her that the call involved child abuse. Because Williams had denied receiving a child abuse report, I followed up with the RCSC and requested the audio recording of the phone call.

[] The RCSC's audio recording only had the portion of the audio recording before the call was transferred to Lajuana Williams, at which point the RCSC was no longer involved in the call. However, it was clear from the recording that the caller described conduct that constitutes child abuse under the Office of the Attorney General's policies. Moreover, when the RCSC employee transferred the call to Lajuana Williams, that RCSC employee specifically described the call as "an alleged abuse call" and the caller as "claiming alleged abuse against the youngest child." From this audio recording, I concluded that Lajuana Williams had failed to report child abuse in violation of agency policy and that, when she denied having received a call about child abuse, that denial was a lie. I have reviewed the audio transcription attached to this affidavit as Exhibit C. The phone conversations it transcribes are the same conversations that I listened to on the audio recording that I received from the RCSC.

[] On Friday, June 29, 2012, the Nederland [] Office received a phone call from a non-custodial parent ("NCP"). The NCP had an active child support case with our office. He was angry about a phone call he had received from the Nederland office earlier that day. According to the NCP's account, as it was relayed to me, the NCP had gone to pick up his child and had become concerned about whether the child had been in a safe environment. The NCP called the police and CPS, who told him to keep the child in his possession while they investigated his

claims. The NCP alleged that the custodial parent ("CP") had called a member of the staff at the Nederland office [] for assistance getting her child back. Shortly thereafter, the NCP received a call from the Nederland office. The woman on the phone, who represented herself as someone with authority in the Office of the Attorney General, instructed the NCP to return his child to the CP. Although the angry NCP could not identify the person who had spoken to him, he said that he thought the voice on the telephone belonged to the same person that he and the CP had met with when they had come into the office for their negotiation conference. The angry NCP also said he would come in and provide proof of the call by showing them his phone.

[] Using caller I.D. to identify the angry NCP's cell phone number, I decided to review the outgoing calls from the Nederland office telephones. It was already near 5:00 PM when we received the NCP's phone call. After business hours, I went telephone by telephone and reviewed the call history to determine if anyone had called the angry NCP. From this review, I determined that a 13-minute call to NCP's cell phone had been placed from the telephone in Lajuana Williams's office at 12:22 PM earlier that day. I took a picture of her phone to document what I had discovered. A true and accurate copy of that picture (redacted to avoid disclosing NCP's phone number) is attached to this affidavit as Exhibit D.

[] The next business day, I met with the angry NCP in my office. He relayed the same account of what had happened (described in paragraph 10 above) and showed me his cell phone. The time stamp on his cell phone matched the time stamp on Lajuana Williams's office phone. He also filed a formal complaint about what had happened. A true and accurate copy of that complaint (redacted to avoid disclosing NCP's personal information) is attached to this affidavit as Exhibit E.

[] After the meeting with the angry NCP, Jay Webster and I interviewed the staff of the Nederland office. Every person denied making the phone call. Shortly thereafter, I checked the caller I.D. on her phone again and saw that the entry I had previously reviewed and photographed had been deleted. Based on the evidence available to me at the time, I

12

concluded that Lajuana Williams had made the phone call described to me by the angry NCP.

[] I never witnessed Jay Webster treat female employees differently than male employees. I never witnessed Jay Webster treat African American employees differently than white employees.

[] The decision to terminate Lajuana Williams's employment with the Office of the Attorney General of Texas had nothing to do with her race, gender, or any complaints she may have had. The decision to terminate her employment was based on the policy violations and misconduct described in the request to terminate, including her failure to report child abuse.

In Webster's affidavit attached to the Plea, Webster stated, in relevant part:

[] I am a licensed attorney in the State of Texas. After a year working for the Office of the Attorney General ("OAG") between 1995 and 1996, I went into private practice. I started working at the OAG again in 2006 as a Managing Assistant Attorney General ("MAAG") in the Nederland [] Office. Effective November 7, 2016, I started working as the MAAG for an office in Beaumont.

[] The Nederland office conducts the routine business of the Child Support Division for a five-county area. The office is involved in the establishment and enforcement of child support orders. The MAAG oversees the entire office, but works primarily with several Assistant Attorneys General (the lawyers). In addition to the lawyers, there are also over two dozen non-legal personnel who process and prosecute child support cases in administrative and judicial proceedings. These non-legal personnel include Child Support Officers ("CSO's") and Child Support Technicians ("CST's").

[] The primary difference between a CSO and a CST is that CSOs, unlike CSTs, are trained to make (1) assessments based on the entirety of the case and (2) decisions about the appropriate next step in the case. CSOs perform a variety of functions, including "establishment" (initializing cases), "enforcement" (seeking to collect child support

13

based on existing orders), "modification" (altering existing orders), and "financial" (ensuring that funds are both received and distributed properly).

[] When Lajuana Williams first started in the Nederland office, there was no position available for her. To allow Ms. Williams to come to the Nederland office, a vacancy was transferred from another office, meaning Nederland received an additional, unrequested Full-Time-Equivalent position. Both because of this vacancy transfer and as consequence of the ever-changing needs of the office, Ms. Williams performed various CSO functions during her employment in the Nederland office. For example, at one point Ms. Williams worked as a review and modification CSO because the office had a backlog of applications that needed to be reviewed for potential modification. Eventually, the Nederland office caught up on its application backlog and it [was] determined by the management team that a specialized review and modification position was no longer needed.

[] As MAAG, I am responsible for everything that happens in the Nederland office. However, my primary focus as the MAAG was on the legal aspects of the office. I worked primarily with my staff attorneys (the Assistant Attorneys General), the CSTs who went to court with us regularly, and the office manager and office supervisor. The office manager or office supervisor were the people directly responsible for overseeing the CSOs's work, assignments, and evaluations. I rarely interacted with the CSOs directly. I did not have direct supervisory contact with Ms. Williams. Instead, Veronica Burns (before her injury in a car accident) and Billy Boyd were primarily responsible for managing her and the other CSOs. Other than exchanging pleasantries in the hallway, I did not interact with Lajuana Williams on a regular basis. I estimate that I usually had meaningful interactions with her only once or twice a month.

[] OAG policy [] prohibits leaving secured doors open and talking to customers through the open secured door because that practice leaves the rest of the staff unsecured. It also prevents management from monitoring the traffic to and from the office. The OAG's policy also prevents personal issues from being aired in the hallway.

14

[] At some point during Lajuana Williams's employment, an incident occurred involving Ms. Williams talking to a customer through a secured door and a subsequent shouting match between Ms. Williams and another staff member. An investigation ensued into what happened, but the investigation did not specifically target Ms. Williams. My personal concern about the incident stemmed more from the shouting match between employees in the office.

[] Prior to the misconduct and policy violations that occurred in July 2012, I had never written up Lajuana Williams. During my time in the Nederland [] office prior to July 2012, Lajuana Williams was never written up.

[] Throughout 2012, the Nederland [] office spent a considerable amount of time at each staff meeting talking about family violence and the seriousness with which staff needed to defer to that designation in their files. We did not want people with a family violence issue or history in the offices together because it posed a potential safety risk for them and for office staff. As discussed more below, repeated emphasis on the family violence policy during the months preceding her termination, Williams violated OAG policy by setting cases with family violence flags on them for the Child Support Review Process ("CSRP"), including a negotiation conference in the Nederland [] office.

[] In July 2012 (and to-date), the OAG Child Support Division used (and uses) a computer software system entitled the Texas Child Support Enforcement System ("TXCSES"). TXCSES uses an auto-scheduler for CSRP. CSRP refers to the administrative process that serves as an alternative to legal action. The primary purpose of the CSRP is to give the parties an opportunity to come into the Child Support Division office and negotiate an agreed order without having to go to Court.

[] The TXCSES auto-scheduler sets CSRP cases for a negotiation conference, but not if the case has been flagged with a Family Violence Indicator. If a case has been flagged with a Family Violence Indicator, TXCSES will *not* automatically set it for CSRP or a negotiation conference. After a Family Violence Indicator has been added, a case

15

can only have been set for CSRP (or a negotiation conference) manually by a user (e.g. a CSO). After the case is manually set for CSRP by a user (e.g. a CSO), TXCSES will automatically send out the notices to the parties. When a Family Violence Indicator has been put on the case, TXCSES will only distribute the notices *after* the case has been manually set for CSRP. This description applies to all types of cases: establishment cases, modification cases, and enforcement cases.

[] Information such as who placed a Family Violence Indicator on the case, when the Family Violence Indicator was placed, who set the case for CSRP, when the case was set for CSRP, and when the TXCSES system sent out the notices to the parties is all available and verifiable in the TXCSES system.

[] Part of my duties as the MAAG for the Nederland office included identifying systemic areas for improvement for the Nederland office. The Child Support Division has a search program called "IDEAS" that uses data from TXCSES to, among other things, help management identify and correct systemic problems. In July 2012, I determined that the Nederland office had too many "dead cases"—cases in which the NCP was not paying child support and there was no court order to pay child support.

[] On July 23, 2012, as we approached the end of the 2012 fiscal year, I was reviewing dead cases to figure out what our office needed to do [to] move them forward. This review was not limited to Lajuana Williams's cases, but rather all dead cases resulting from CSRPs. While conducting this review, I discovered that Ms. Williams had manually set a case flagged with a Family Violence Indicator for CSRP. This jumped out at me because we had been emphasizing the family violence policy at our staff meetings. Setting a case with a Family Violence Indicator for CSRP violated OAG policy and created a potential safety hazard.

[] From my review of the TXCSES case file, I determined that on June 20, 2012, Williams manually set a case for a CSRP, setting the case for an in-office negotiation conference on July 5, 2012, at 3:00 PM. After Williams manually set the case for CSRP, letters for the negotiation

16

conference were automatically sent to the addresses listed for the parties on the computer system. While Williams eventually terminated the negotiation conference, that termination did not occur until almost two weeks *after* the scheduled in-office conference. Williams's decision to set the case for CSRP violated OAG policy and created a potential safety hazard.

[] Even today I can log in to the TXCSES system and verify that Lajuana Williams was responsible for manually setting the case for CSRP and the negotiation conference. Exhibit A is a screen print of the TXCSES system showing on line 16 that the case did not meet the auto-scheduler criteria. TXCSES then created a system message to an employee that this case must be reviewed for the next action. TXCSES would not allow itself to set this case for CSRP referral, only an employee can override these protections and manually set the case for CSRP. Exhibit B is a screen print of the TXCSES system in which line 14 shows that this case was manually referred for CSRP by an employee. Exhibit C is a screen print of the TXCSES system line 14 which shows the user ID of the employee who manually referred this case for the CSRP process. The user ID shown to have initiated and completed this manual referral is C55LRA which is the user ID for Ms. Williams. Once Ms. Williams manually referred the case for CSRP, the TXCSES system then directed her for the next action which is scheduling the CSRP for the negotiation conference. Exhibit D is a screen print of the TXCSES system line 12, asking the employee to manually schedule this CSRP referral for a negotiation conference. Exhibit E is a screen print of the TXCSES system line 12, showing that the user ID of the employee who manually set the date of the negotiation conference was C55LRA which is the user ID for Ms. Williams. The date of the negotiation conference was set by Ms. Williams for July 5, 2012 at 3:00 p.m. Exhibit F is a screen print of the TXCSES system, line 14 showing the negotiation conference was manually terminated but not until 12 days after the conference was to be held. Exhibit G is a screen print of the TXCSES system, line 14, showing the user ID of the employee that manually terminated the CSRP. The user ID is C55LRA which is the user ID for Ms. Williams.

17

[] When I spoke to Lajuana Williams about setting the case for CSRP, she told me she caught it in time and cancelled it before the CSRP. I told her this was not accurate, as the CSRP conference had passed before she terminated the CSRP. She then told me that she made the same error in another case, but terminated it before the notices were sent out to the parties.

[] To my knowledge, during the entirety of her employment with the OAG, Lajuana Williams never accused me of discriminating against her based on her race or gender. She certainly never made any such accusations to my face. During the entirety of her employment with the OAG, Chip Arnold never said anything about Ms. Williams accusing me of race discrimination or gender discrimination. Ms. Williams never asked me whether my decisions regarding her employment had something to do with her race or her gender. I have never treated Ms. Williams in a discriminatory fashion based on either her race or gender nor in retaliation for any complaint she may have made against me.

[] As Billy Boyd and I discovered Lajuana Williams's misconduct and policy violations in July 2012, I kept my direct report Chip Arnold aware of what we had found. We did not make a recommendation to the regional office about what disciplinary action was appropriate. In late July, Kristine Blackstone indicated that the state office had decided to terminate Lajuana Williams's employment. As per that decision, I wrote a request for termination that was subsequently sent to the regional and the state offices for their approval. On August 1, 2012, the OAG terminated Lajuana Williams's employment.

[] The decision to terminate Lajuana Williams's employment with the Office of the Attorney General of Texas had nothing to do with her race, gender, or any complaints she may have made to me, Chip Arnold, or anyone else. The decision to terminate her employment was based on the policy violations and misconduct described in the request to terminate.

Arnold's affidavit attached to the Plea was similar to Webster's affidavit. Arnold

stated, in relevant part:

18

[] I am employed by the Office of the Attorney General of Texas ("OAG") as the Regional Administrator for Region 5 of the OAG'S Child Support Division ("CSD") based in Tyler, Texas. I have been employed in this capacity since January 7, 2002. I directly managed Winston "Jay" Webster in the CSD office in Nederland, Texas, beginning on July 17, 2006 and continuing through the end of Lajuana Williams's employment on August 1, 2012. As Regional Administrator, I oversee multiple offices in the Region, including Nederland.

[] I personally visited and conducted management reviews in the CSD offices in Woodville, Texas, in Beaumont, Texas, and Nederland, Texas on November 21-23, 2011.

[] On or about November 22, 2011, Lajuana Williams worked as a Child Support Officer IV assigned to the duties of a Customer Inquiry Representative ("CIR") in the CSD office in Nederland, Texas.

[] On or about November 22, 2011, at Ms. Williams's request, I engaged in a lengthy conversation with her in her office in the CSD office in Nederland, Texas.

[] During the aforementioned conversation, Ms. Williams told me about her background and OAG work experience, giving me a chronology of her work history with the agency.

[] Ms. Williams further told me that Mr. Webster did not fully appreciate her extensive knowledge and skill set and he was underutilizing her abilities by having her serve as a CIR.

[] Ms. Williams further told me that her workload was very light with the CIR assignment and that she could better serve the office in a different role.

[] Ms. Williams further told me that she had many good ideas and thoughts that she felt would improve the office's performance, but that Mr. Webster did not take advantage of her suggestions or implement any of them.

19

[] Ms. Williams further told me that she knew the office was struggling without a full time Office Manager (out on extended leave due to serious injuries from a car accident) and that she had noted that the office needed to establish more paternities.

[] Ms. Williams further told me that, with her extensive experience and knowledge, she would make an extremely good establishment Child Support Officer ("CSO") and she wanted to become such to assist the office.

[] Ms. Williams further told me, several times, that if she could just be given the opportunity to be an establishment CSO, she would make a positive difference for the office's goals based on her extensive knowledge, skill set, and experience.

[] Ms. Williams further told me that she was giving me this information because she did not feel that Mr. Webster recognized how beneficial she could be to the office and what a positive difference she could make if she were assigned to be an establishment CSO.

[] I told Ms. Williams that I appreciated her bringing this information to my attention and that I would speak with the Nederland managers, in particular, Mr. Webster, about her request and desire to better serve the office in the role of an establishment CSO.

[] I further told Ms. Williams that while I would share her information and desire with the Nederland office management, I left such task and duty assignments up to the local office managers since the local management team knows best how to allocate its limited resources based on the office's business needs at any given time.

[] At no time during this conversation with Ms. Williams [did she] ever tell me that Mr. Webster had issue[s] with her based on her race.

[] I am certain that at no time during this conversation with Ms. Williams did she ever say anything about any kind of discrimination, bias, or prejudice on the part of Mr. Webster or any other manager in the CSO

20

office in Nederland, because such an allegation would have triggered an investigation by me into the matter.

[] During July 2012, Mr. Webster and Mr. William ("Billy") Boyd kept me apprised about what was going on with Ms. Williams, specifically the failure to report child abuse, the incident with the non-custodial parent being instructed to return a child, and setting a case flagged for Family Violence Indicator for a negotiation conference pursuant to the Child Support Review Process ("CSRP"). At some point, I determined that I needed guidance from my direct report at the time, Deputy Director for Field Operations Kristine Blackstone. I wanted to make sure that the disciplinary action we imposed for Ms. Williams's misconduct and policy violations were both appropriate and consistent with agency-wide practices. Ms. Blackstone took it to Director Charles Smith, who indicated that the recommendation should be written up as a termination. I relayed this information to Mr. Webster and Mr. Boyd, who proceeded accordingly.

[] The decision to terminate Lajuana Williams's employment with the Office of the Attorney General of Texas had nothing to do with her race, gender, or any complaints she may have made (including the conversation she had with me on November 22, 2011). The decision to terminate her employment was based on the policy violations and misconduct described in the request to terminate.

In the Sine's affidavit attached to the Plea, Sines stated, in relevant part:

[] I am the Deputy Director of Field Operations for the Child Support Division of the Attorney General of Texas ("OAG"). I started my career with the OAG July 27, 1995 and was named Deputy Director of Field Operations May 1, 2016.

[] In 2012, the OAG had Regional Customer Service Centers ("RCSC") for each of the nine regions. Under the OAG's Reporting Child Abuse/Neglect & Sexual Misconduct Policy at the time, "[i]f a [RCSC] receives a call in which the caller wants to report an instance of abuse/neglect, the RCSC forwards the call to the appropriate field office. Field office staff are then responsible for making the report [to

21

the Department of Family and Protective Services (DFPS)"]. DFPS is a state agency that includes Child Protective Services (CPS). Abuse is defined in the OAG's Reporting Child Abuse policy to include not only direct physical or sexual abuse but also mental or emotional injury to a child. A true and accurate copy of this policy, as it existed in July 2012, is attached to this affidavit as Exhibit A.

[] If the RCSC forwards an abuse call to a field office for the field office to report the abuse to DFPS, the field office staffer who receives the call is obliged to make the report to DFPS. The field office staff who receives the call does not have discretion to refrain from making a report to DFPS even if he or she second-guesses the RCSC determination that the conduct described by the caller constitutes child abuse.

[] Child abuse is different than family violence. Child abuse refers to abuse directed at, or directly affecting, a child. Family violence could include child abuse, but could also include violence directed only between adults. Making a report of family violence in the Texas Child Support Enforcement System ("TXCSES") is different from making a report to DFPS (or, more specifically, CPS). While both are important, reporting family violence in TXCSES does not satisfy the obligation to report child abuse to CPS.

[] The TXCSES auto-scheduler sets CSRP cases for a negotiation conference, but not if the case has been flagged with a Family Violence Indicator. If a case has been flagged with a Family Violence Indicator, TXCSES will *not* automatically set it for CSRP or a negotiation conference. After a Family Violence Indicator has been added, a case can only been [sic] set for CSRP (or a negotiation conference) manually by a user (e.g. a CSO). TXCSES will automatically send out the notices to the parties. When a Family Violence Indicator has been put on the case, TXCSES will only distribute the notices *after* the case has been manually set for CSRP. This description applies to all types of cases: establishment cases, modification cases, and enforcement cases.

[] Information such as who placed a Family Violence Indicator on the case, when the Family Violence Indicator was placed, who set the case

22

for CSRP, when the case was set for CSRP, and when the TXCSES system sent out the notices to the parties is all available and verifiable in the TXCSES system.

Standard of Review

Governmental units are immune from suit unless the State consents. *Alamo Heights Indep. Sch. Dist. v. Clark*, 544 S.W.3d 755, 770 (Tex. 2018) (citing *Mission Consol. Indep. Sch. Dist. v. Garcia*, 372 S.W.3d 629, 636 (Tex. 2012); *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 224 (Tex. 2004)). Immunity from suit may be asserted by a plea to the jurisdiction or motion for summary judgment. *Id*. The plea may challenge the pleadings, the existence of jurisdictional facts, or both. *Id*. When a governmental entity files a plea to the jurisdiction that challenges the existence of jurisdictional facts and the pleas are supported with evidence, the standard of review used to review the ruling the trial court made on the plea mirrors the standard used in reviewing rulings that trial courts make on traditional motions for summary judgment. *Id.* at 771. "[I]f the [plaintiffs'] factual allegations are challenged with supporting evidence necessary to consideration of the plea to the jurisdiction, to avoid dismissal [the plaintiff] must raise at least a genuine issue of material fact to overcome the challenge to the trial court's subject matter jurisdiction." *Miranda*, 133 S.W.3d at 221. "A defendant who conclusively negates at least one of the essential elements of a cause of action or conclusively establishes

23

an affirmative defense is entitled to summary judgment." *Frost Nat'l Bank v. Fernandez*, 315 S.W.3d 494, 508 (Tex. 2010).

We review the trial court's decision using the burden-shifting framework as explained by the Texas Supreme Court in *Clark. See* 544 S.W.3d at 764 ("[W]e hold that when jurisdictional evidence negates the prima facie case or, as in this case, rebuts the presumption it affords, some evidence raising a fact issue on retaliatory intent is required to survive a jurisdictional plea."). In our de novo review of the trial court's ruling, we take as true all evidence favorable to the nonmovant, indulging in every reasonable inference and doubt that favors the nonmovant. *See Miranda*, 133 S.W.3d at 228 (explaining the standard as it applies to a plea to the jurisdiction); *see also Diversicare Gen. Partner, Inc. v. Rubio*, 185 S.W.3d 842, 846 (Tex. 2005) (explaining the standard as it applies to a traditional motion for summary judgment). In conducting our review, however, "we cannot disregard evidence necessary to show context, and we cannot disregard evidence and inferences unfavorable to the plaintiff if reasonable jurors could not." *Clark*, 544 S.W.3d at 771.

Retaliation Claim

Chapter 21 of the Texas Labor Code, also known as the Texas Commission on Human Rights Act (TCHRA), waives sovereign immunity, but only for those suits that meet the prima facie elements of a claim. *Mission Consol. Indep. Sch. Dist.*

24

*v. Garcia*, 372 S.W.3d 629, 635-36 (Tex. 2012). The prima facie case is the first step to bringing a claim under the TCHRA. *Id*; *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973).

As stated by the Texas Supreme Court in *Clark*, "the TCHRA prohibits retaliation against an employee for engaging in certain protected activities[.]" 544 S.W.3d at 781; *see also* Tex. Lab. Code Ann. § 21.055. "An employee engages in a protected activity by, among other things, filing an internal complaint, opposing a discriminatory practice, or making a charge of discrimination with the EEOC." *Clark*, 544 S.W.3d at 786. However, an employee is not protected from discipline, or even termination, following a discrimination complaint. *Id.* at 764. "Rather, a remedy exists only when the evidence establishes that a materially adverse employment action *resulted from* the employee's protected activities." *Id.* (emphasis added). A retaliation claim is related to but distinct from a discrimination claim, and it focuses upon the employer's response to the employee's protected activity, such as the employer's response to the employee's complaint about discrimination. *Id*. at 763-64.

To establish a prima facie case of retaliation under the TCHRA, an employee must show: (1) she engaged in an activity protected by the TCHRA, (2) she experienced a material adverse employment action, and (3) a causal link exists

25

between the protected activity and the adverse action and that the adverse action would not have occurred "but for" the protected activity. *Id*. at 782. If the employee can establish a prima facie case, a rebuttable presumption of illegal intent arises. *Id.* The employer can defeat this presumption by producing evidence of a legitimate, nondiscriminatory reason for the termination. *Id.* "Once rebutted, the presumption disappears, and an employee lacking direct evidence cannot prove a statutory violation without evidence that the employer's stated reason is false and a pretext for discrimination." *Id.* "[T]he burden of persuasion remains at all times with the employee." *Id.*

> In evaluating but-for causation evidence in retaliation cases, we examine all of the circumstances, including temporal proximity between the protected activity and the adverse action, knowledge of the protected activity, expression of a negative attitude toward the employee's protected activity, failure to adhere to relevant established company policies, discriminatory treatment in comparison to similarly situated employees, and evidence the employer's stated reason is false.

*Id.* at 790. "The but-for causation standard is significantly more difficult to prove than prima facie causation." *Id*. at 782.

Analysis

Assuming without deciding that Williams stated a prima facie case of retaliation based on her termination, any presumption raised was rebutted when the OAG produced evidence of three legitimate, nondiscriminatory reasons for her

26

termination. *Id.* at 790. Williams had the burden to establish a fact issue to show the stated reasons were a pretext and that she would not have been terminated but for her alleged protected activity.[4] *Id.*

When, as here, the jurisdictional evidence submitted by the employer rebuts the prima facie case, the entire *McDonnell Douglas*[5] framework is fully implicated, and sufficient evidence of pretext and causation must exist to survive the jurisdictional plea. *Id.* at 764, 782-83. Accordingly, Williams must prove the adverse action would not have occurred "but for" the protected activity.

In her response to the Plea, Williams argued that her alleged report to Arnold of discriminatory conduct by Webster was a protected activity. She further argued

---

[4] There is no evidence in the record that Williams filed an EEOC or other formal complaint. Williams claims that she reported to Arnold that Webster had discriminated against her based on her race, and that her "complaint" to Arnold was a "protected activity." Arnold denies that Williams ever told him she believed Webster's conduct was based on sex or race discrimination. As noted by the Texas Supreme Court, not every workplace complaint constitutes a "protected activity." *Alamo Heights Indep. Sch. Dist. v. Clark*, 544 S.W.3d 755, 788 (Tex. 2018). An employee engages in a "protected activity" when she files a complaint of discrimination, and possibly when she files an internal complaint. *See* Tex. Lab. Code Ann. § 21.055 (West 2015). At a minimum, the "complaint" must alert the employer to the employee's reasonable belief of unlawful discrimination. *Clark*, 544 S.W.3d at 786. For purposes of our review, we assume without deciding that Williams's alleged verbal complaint to Arnold constitutes a "protected activity."

[5] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 793 (1973) (establishing the procedure for reviewing a disparate-treatment claim when direct evidence of discrimination is lacking).

27

that the OAG created a fact issue about whether she ever said anything to Arnold about "a racist motive." And, she argued that the only remaining element of her prima facie claim would be whether she could show a causal nexus between her report of the discrimination to Arnold and the termination. She argued that the prima facie showing of causation did not require her to preview the merits of her claims, and she argued that the trial court should not examine pretext. According to Williams, she met her burden by showing that she was "blemish free" for twenty-two years, she complained of Webster's discriminatory conduct based on her race, she alleged Webster's hostile behavior escalated, she was never notified of her alleged offenses, she denied she received a call about abuse, and Webster fabricated the three reasons for her termination. She attached her own affidavit to her response to the Plea.

The record before us establishes that eight months passed between her alleged verbal report to Arnold and her termination. Examining the temporal proximity between the report and termination, we conclude that this "gap is so long as to be of little, if any, probative value[]" and weighs against Williams. *See id*. at 790 (citing *Jackson v. Honeywell Int'l, Inc*., 601 Fed. App'x 280, 286-87 (5th Cir. 2015)). With respect to the other factors, even assuming Williams reported the alleged discrimination to Arnold around Thanksgiving 2011, or that Webster had knowledge

28

of her allegations of discrimination prior to her termination, we find there is no evidence in the record that the OAG failed to follow any internal procedures or relevant policies with respect to how it treated Williams. There is no evidence in the record that the OAG treated Williams differently than any similarly situated employees, and there is no evidence in the record that each of the alleged reasons for her termination was false. Although Williams denies each of the alleged reasons, her denials are insufficient to create a fact issue as to causation. *See id.* at 792 ("Clark denies nearly all of these performance issues, but such denials are insufficient to create a fact issue as to causation. The issue is whether the employer's perception of the problems—accurate or not—was the real reason for termination. The record bears no evidence the stated reasons were mere pretext." (footnotes omitted)). We find that the record before us contains no evidence that the stated non-discriminatory reasons were a pretext for a retaliatory intent. *See id*. We overrule Williams's issues.

We conclude that Williams failed to meet her burden to raise a fact issue causally linking her termination to the reported discrimination, governmental immunity has not been waived, and subject matter jurisdiction is lacking. We affirm the trial court's ruling.

AFFIRMED.

_____
LEANNE JOHNSON
Justice

Submitted on June 24, 2019
Opinion Delivered August 8, 2019

Before McKeithen, C.J., Horton and Johnson, JJ.